UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

IRWIN and LINDA SCHWEITZER, as
representatives of the estate of Victoria Schweitzer,
and as next friends to J.S.,

                Plaintiffs,

          v.

LINDA CROFTON and SUFFOLK COUNTY
DEPARTMENT OF SOCIAL SERVICES,

                Defendants.

----------------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**

08-CV-0135 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiffs Irwin and Linda Schweitzer bring the above-captioned action as representatives

of the estate of their daughter Victoria Schweitzer[1] ("Victoria") and on behalf of their

granddaughter J.S., against Defendants Linda Crofton and Suffolk County Department of Social

Services ("DSS"), for claims arising out of Defendants' temporary placement of J.S. in foster

care. Plaintiffs assert claims for procedural due process, substantive due process, and unlawful

seizure pursuant to 42 U.S.C. § 1983. Plaintiffs also assert violations of Title II of the

Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973

---

[1] Victoria Schweitzer died on September 13, 2011 while this lawsuit was pending. (Defs. 56.1 ¶ 2; Pls. 56.1 ¶ 2.) Her parents, Irwin and Linda Schweitzer, were substituted for Victoria, both as representatives of Victoria's estate and as next friends to J.S. (Defs. 56.1 ¶ 2; Pls. 56.1 ¶ 2; *see also* Docket Nos. 57–64.) The parties refer to Victoria Schweitzer as "Victoria" in their submissions. For the sake of clarity, the Court will refer to Victoria Schweitzer as "Victoria" in this Order because she shares the same last name as her parents.

("Rehabilitation Act").[2] Defendants moved for summary judgment on all claims. Plaintiffs

cross moved for partial summary judgment on the unlawful seizure, procedural due process,

ADA, and the Rehabilitation Act claims and for leave to amend the Complaint to substitute

Suffolk County for DSS and to add Elizabeth Hogan, Defendant Crofton's supervisor, as a

defendant. For the reasons set forth below, the Court grants Defendants' motion for summary

judgment and denies Plaintiffs' cross-motion for partial summary judgment. The Court also

denies Plaintiffs' request to amend the Complaint.

## I. Background

Victoria Schweitzer suffered from bi-polar disorder for which she was prescribed

psychiatric medication, including Lithium and Zyprexa. (Defs. 56.1 ¶ 3; Pls. 56.1 ¶ 3;

Deposition of Victoria Schweitzer ("VS Dep.") at 25.) She had a history of non-compliance with

psychiatric treatment and medication and had previously been hospitalized for reasons related to

her disorder. (Defs. 56.1 ¶ 4; Pls. 56.1 ¶ 4; see Deposition of Rosalie Banovich ("Banovich

Dep.") 25:4–11; Deposition of Elizabeth Lunde ("Lunde Dep.") 26:1–23.) According to

Plaintiffs, "[d]uring recent times, Victoria remained medication compliant and administered her

own medicine." (Pls. Opp'n Mem. 6; see Deposition of Linda Schweitzer ("LS Dep.") 22:4–7.)

Victoria lived independently in housing provided by Concern for Independent Living,

Inc. ("CIL") and a case manager visited her on a regular basis. (Defs. 56.1 ¶ 5; Pls. 56.1 ¶ 5; see

Lunde Dep. 14:11–20.) An Assertive Community Treatment ("ACT") team would typically visit

Victoria twice a week to provide mental health support, such as medication management, client

---

[2] On September 10, 2010, United States District Judge Denis R. Hurley dismissed
Plaintiffs' conspiracy claims against Defendants DSS and Crofton. (Docket No. 45 ("Sept. 1,
2010 Order").) The case was subsequently reassigned to the undersigned on March 23, 2012.

counseling, and case management services.  (Defs. 56.1 ¶ 6; Pls. 56.1 ¶ 6; *see* Banovich Dep. 14:5–15:4; VS Dep. 27:3–31:15.)

In late November 2004, Victoria became pregnant by her boyfriend, who suffered from schizophrenia.  (Defs. 56.1 ¶ 7; Pls. 56.1 ¶ 7.)  In December, upon instructions from her doctor, Victoria discontinued or reduced the dosage of her Lithium medication out of concern that the medication would harm the baby.[3]  (Pls. 56.1 ¶ 64; Linda Schweitzer Affidavit ("LS Aff.") ¶ 14.) According to Victoria's mother, Linda Schweitzer, once Victoria was placed back on Lithium, she stabilized at the "highest level she was capable of functioning."  (Pls. 56.1 ¶ 65; *see* LS Aff. ¶ 14.)

Staff members at CIL were worried about Victoria's health throughout her pregnancy and questioned where the baby would live after she was born.  (Defs. 56.1 ¶ 8; Pls. 56.1 ¶ 8.)  CIL staff members had the experience of showing up for case management visits, ringing the doorbell, banging on the door, and calling Victoria's phone, only to find that Victoria was unable to respond because she was sound asleep.[4]  (Defs. 56.1 ¶ 9; Lunde Dep. 21:1–13.)  Elizabeth Lunde, Associate Director of CIL, was concerned that Victoria would not be able to take care of the baby on her own and was worried about Victoria being the sole caretaker for almost any portion of the day.  (Defs. 56.1 ¶ 10; Lunde Dep. 21:9–24, 40:5–7.)  According to Lunde, CIL

---

[3] It is unclear from the parties' papers whether Victoria's medications were reduced or discontinued entirely.  (*Compare* Pls. 56.1 ¶ 64 (medication "discontinued"); Defs. Reply 56.1 ¶ 64 (same); Defs. 56.1 ¶ 4 (Victoria "was made to go off her [Lithium]"); Banovich Dep. 41:19–22 (medication "discontinued"); *with* Defs. 56.1 ¶ 34 (medications "reduced"); LS Aff. ¶ 6 ("During the pregnancy . . . . [Victoria's] psychiatrist lowered her dosage of lithium . . . .").)

[4] Plaintiffs object to many of the fact statements regarding information provided by Victoria's service care providers as hearsay.  (*See, e.g.* Pls. 56.1 ¶ 9; Pls. 56.1 Counter-Stmt. ¶ 34.)  These statements are offered to reflect the state of mind of the caseworker, not for their truth, and therefore they are not hearsay.  *See Whiting v. Old Brookville Bd. of Police Comm'rs*, 4 F. App'x 11, 14 (2d Cir. 2001) ("These statements were admitted not for their truth but for their effect on defendants' state of mind in pursuing charges against [plaintiff], and were therefore not hearsay.").

proposed to Victoria's parents that, at a minimum, one of them stay overnight with Victoria and her daughter to see whether she was able to respond to the infant, and to assist her in doing so, but that "didn't happen."[5] (Defs. 56.1 ¶ 10; Lunde Dep. 40:13–24, 106:2–15.) CIL staff members were also concerned about Victoria's physical condition because of her obesity. (Defs. 56.1 ¶ 9; Lunde Dep. 30:12–22.) In May 2005, Victoria was 5 foot 5 inches tall and weighed approximately 300 pounds. (Defs. 56.1 ¶ 9; Pls. 56.1 ¶ 9; LS Dep. 126:3–25.) ACT team members were similarly concerned about Victoria's ability to care for her baby given her long psychiatric history and past non-compliance with treatment and medications. (Defs. 56.1 ¶ 11; Pls. 56.1 ¶ 11; see Banovich Dep. 87:10–24.)

Victoria's parents lived approximately 15 to 25 minutes away from Victoria. (Defs. 56.1 ¶ 13; Pls. 56.1 ¶ 13.) They offered to help care for the child; however, Victoria assumed that she would care for the child herself. (Defs. 56.1 ¶ 13; Pls. 56.1 ¶ 13; VS Dep. 81:7–20; LS Dep. 42:25–45:2.) Victoria's parents purchased provisions for the baby, including a crib, playpen and toys. (Defs. 56.1 ¶ 14; Pls. 56.1 ¶ 14; VS Dep. 68:8–25.) In order to prepare for motherhood, Victoria completed a parenting class at Stony Brook University. (VS 84:19–85:12.)

On April 26, 2005, Victoria was admitted to Stony Brook University Medical Center ("Stony Brook Hospital") for complications related to her pregnancy, including pre-eclampsia and high blood pressure. (Defs. 56.1 ¶ 15; Pls. 56.1 ¶ 15.) As a result of Victoria's Lithium medication, J.S. was born prematurely. (Defs. 56.1 ¶ 17; Pls. 56.1 ¶ 17.) Victoria gave birth to J.S. by cesarean section on May 17, 2005. (Defs. 56.1 ¶ 15; Pls. 56.1 ¶ 15; VS Dep. at 84:12–13.) Due to delivery complications, Victoria remained hospitalized until approximately May 21, 2005, and J.S. remained hospitalized until approximately May 28, 2005. (Defs. 56.1 ¶ 15; Pls.

---

[5] Linda Schweitzer states that Lunde never spoke to either her or her husband about Victoria and the baby living with them after the baby was born. (Pls. 56.1 ¶ 10; LS Aff. ¶ 29.)

56.1 ¶ 15; VS Dep. 102:7–22.)  J.S.'s condition improved once the Lithium passed out of her system.  (*Id.*)

While in the hospital, Victoria became "mad" and "annoyed" when the psychiatry staff asked her who the president was and what day of the week it was.  (Defs. 56.1 ¶ 16; Pls. 56.1 ¶ 16; VS Dep. at 90:4–91:23.)  Plaintiffs claim that Victoria became mad and annoyed because she felt that the actions of the hospital staff were demeaning, and they maintain that Victoria did not respond in an irritated manner.  (Pls. 56.1 ¶ 16; VS Dep. 90:4–92:21.)  Darlene Gelin, a social worker from Stony Brook Hospital, stated in her records that Dr. Burke felt the baby faced no immediate physical or emotional danger from the mother.  (Defs. 56.1 ¶ 20; Pls. 56.1 ¶ 20; Defs. Ex. E. ("May 20, 2005 Gelin Record").)  However, due to concerns about Victoria's level of irritability, a referral was made to the Child Protective Services ("CPS") hotline.  (*Id.*)  CPS rejected the referral, and Gelin informed hospital staff of the need to monitor Victoria's interaction with the baby closely.  (*Id.*)

On or about May 21, 2005, Victoria was discharged from the hospital and stayed with her parents in order to recuperate.  (Defs. 56.1 ¶¶ 22, 28; Pls. 56.1 ¶ 22, 28.)  Gelin reported that Victoria was "extremely uncomfortable while holding the baby."  (Defs. 56.1 ¶ 23; Pls. 56.1 ¶ 23; Defs. Ex. F ("May 24, 2005 Gelin Report").)  Victoria "reportedly had a light grasp of [the] child and could not support the head properly" and was at risk of dropping the baby.  (*Id.*)  Gelin further stated that on May 24, Victoria "reportedly became excessively alarmed when the baby sneezed."  (*Id.*)  Due to Gelin's observations of Victoria, her contacts with CIL, and Victoria's interactions with the baby, Gelin was "concerned about Victoria's ability to adequately care for this infant upon discharge" and another CPS referral was made.  (*Id.*)  This referral was accepted and a report was registered at the State Central Registry ("SCR").

On May 25, 2005, caseworker Lisa Crofton was assigned to investigate the SCR report, which alleged that Victoria was unable or unwilling to provide sufficient supervision for her baby. (Defs. 56.1 ¶ 24; Pls. 56.1 ¶ 24; *see* Crofton Aff. Ex. A ("SCR Report").) The report narrative stated that "[s]ince the birth, mother has been exhibiting inappropriate behavior while with the child" and that in two instances, Victoria panicked while with the child. (*Id.*) The report further stated that the "medical opinion" is that "the mother's inappropriate behavior towards the child is rendering her incapable of providing adequate care for the child." (*Id.*)

That same day, Crofton made a phone call to the reporting party[6] and verified the allegations in the report. (Defs. 56.1 ¶ 25; Pls. 56.1 ¶ 25; Crofton Aff. ¶ 4 n.1.). The reporting party stated that the CIL case manager expressed a concern to the reporting party that she had observed Victoria display erratic behavior and become easily agitated. (*Id.*). The reporting party noted that although this behavior was not observed while Victoria was hospitalized, she was taking medications at that time. (*Id.*) Later that day and the next day, Crofton made unscheduled home visits to Victoria's residence, but there was no response. (Defs. 56.1 ¶ 26; Pls. 56.1 ¶ 26; Crofton Aff. ¶ 5.). Crofton called Victoria's mother, who stated that Victoria had been staying with her while she recovered from her cesarean section. (Defs. 56.1 ¶ 28; Crofton Aff. ¶ 7.) Plaintiffs assert that during this phone call, Linda Schweitzer told Crofton that Victoria was staying with her parents following her discharge from Stony Brook Hospital and would stay with her parents for some time. (Pls. 56.1 ¶ 28; LS. Aff. 16.) Plaintiffs further assert that Linda Schweitzer told Crofton that Victoria could be brought to her own apartment later that day for a meeting. (*Id.*) Linda Schweitzer then put Victoria on the line, and Crofton informed Victoria of

---

[6] The identity of the reporting party is confidential pursuant to section 422 of the New York Social Services Law. (*See* Crofton Aff. ¶ 4.)

the CPS report filed against her and the need to conduct an investigation. (Defs. 56.1 ¶ 29; Pls. 56.1 ¶ 29; Crofton Aff. ¶ 8.)

On May 26, 2005, Crofton met with Victoria at Victoria's home. Crofton observed that the home was clean and neatly maintained and there was a sufficient food supply. (Defs. 56.1 ¶ 30; Pls. 56.1 ¶ 30; Crofton Aff. ¶ 9.) Although there was no baby formula in the home, Victoria stated that she planned to purchase formula before the baby was discharged from the hospital. (*Id.*) Crofton observed that Victoria had difficulty climbing the stairs and sitting up comfortably. (*Id.*) Crofton shared the allegations of the SCR report with Victoria, and Victoria denied acting inappropriately or panicking. (Defs. 56.1 ¶¶ 31–32; Pls. 56.1 ¶¶ 31–32.). Victoria stated that the ACT team, CIL, and her parents would provide support to her. (Defs. 56.1 ¶ 32; Pls. 56.1 ¶ 32; Crofton Aff. ¶ 11.) According to Crofton, Victoria stated that once the baby was discharged from the hospital, Victoria's mother would visit but would not be staying in Victoria's home. (Defs. 56.1 ¶ 32; Crofton Aff. ¶ 11.) Plaintiffs dispute this statement "to the extent that the statement implies that Victoria Schweitzer intended to convey that Victoria and infant [J.S.] would immediately move to Victoria's apartment upon discharge of [J.S.] as Victoria was to live with her parents while she recuperated from medical problems arising out of her delivery." (Pls. 56.1 ¶ 32; LS Aff. ¶ 16.)

Crofton also spoke with Denise Duncan, a CIL employee, and Lunde. (Defs. 56.1 ¶ 34; Pls. 56.1 ¶ 34; Crofton Aff. ¶ 13.) According to Lunde, CIL questioned Victoria's ability to care for the infant because she sleeps heavily due to her medications, and she may have difficulty moving the infant up and down the stairs. (Defs. 56.1 ¶ 34; Pls. 56.1 ¶ 34; Crofton Aff. ¶ 13.) CIL staff told Crofton that their case manager only visited once each week for an hour and that they preferred for the grandparents to stay with Victoria at her home for a week before allowing

the baby to live alone with Victoria. (Defs. 56.1 ¶ 34; Pls. 56.1 ¶ 34; Crofton Aff. ¶ 13.) Lunde stated that she knew the grandparents were thinking of visiting Victoria during the day but did not plan to stay at night. (Defs. 56.1 ¶ 34; Pls. 56.1 ¶ 34; Crofton Aff. ¶ 13) In Lunde's opinion, when Victoria decompensated[7] and when her medications were reduced at the beginning of her pregnancy, she would not have been able to care for the baby. (Defs. 56.1 ¶ 34; Pls. 56.1 ¶ 34; Crofton Aff. ¶ 13) Lunde expressed concern that, if the hospital discharged the baby over Memorial Day weekend, a CIL worker would not be able to visit Victoria until after the holiday weekend. (Defs. 56.1 ¶ 34; Pls. 56.1 ¶ 34; Crofton Aff. ¶ 13.)

Crofton then spoke with Dr. Shariff at the Stony Brook Hospital neonatal intensive care unit. (Defs. 56.1 ¶ 35; Pls. ¶ 35; Crofton Aff. ¶ 14.) He stated that the hospital was waiting for CPS clearance before discharging the baby. (Defs. 56.1 ¶ 35; Pls. ¶ 35; Crofton Aff. ¶ 14.) Dr. Shariff expressed concern for Victoria's ability to care for the baby and the quality of daily care the baby would receive. (Defs. 56.1 ¶ 35; Pls. ¶ 35; Crofton Aff. ¶ 14.) On May 27, 2005, Crofton spoke with ACT team nurse Rada Vukcevic, who had knowledge of Victoria's psychiatric history. (Defs. 56.1 ¶ 36; Pls. 56.1 ¶ 36; Crofton Aff. ¶ 15.) Vukcevic stated she was "very concerned" for Victoria's ability to care for her baby. (Defs. 56.1 ¶ 36; Pls. 56.1 ¶ 36; Crofton Aff. ¶ 15.) She explained that Victoria was on Zyprexa for her bi-polar disorder and that she was currently on 10 mg but had previously been on 20 mg. (Defs. 56.1 ¶ 36; Pls. 56.1 ¶ 36; Crofton Aff. ¶ 15.) Victoria wanted to remain on 10 mg while caring for the baby because she was afraid she may not hear the baby if she were to take a higher dosage. (Defs. 56.1 ¶ 36; Pls.

---

[7] Decompensation is "[a]n acute exacerbation or worsening of a clinical condition," in this case bi-polar disorder, "that occurs when corrective mechanisms cannot maintain the individual at an optimal level of functioning; the deterioration of existing defenses, leading to an exacerbation of pathologic behavior." CONCISE DICTIONARY OF MODERN MEDICINE (McGraw-Hill Company, Inc. 2002).

56.1 ¶ 36; Crofton Aff. ¶ 15.)  Vukcevic stated Victoria did better on 15 to 20 mg of Zyprexa and that she was not certain Victoria would be stable on 10 mg.  (Defs. 56.1 ¶¶ 36–37; Pls. 56.1 ¶¶ 36–37; Crofton Aff. ¶ 16.)  She stated that Victoria was easily agitated.  (Defs. 56.1 ¶¶ 37; Pls. 56.1 ¶¶ 37; Crofton Aff. ¶ 16.).  She also stated that although the ACT team could provide intensive visits, Victoria did not respond well to unscheduled visits.  (Defs. 56.1 ¶ 37; Pls. 56.1 ¶ 37; Crofton Aff. ¶ 16.)  She told Crofton that Victoria did not deal well with her parents and that Victoria did not like them giving her orders.  (Defs. 56.1 ¶ 37; Pls. 56.1 ¶ 37; Crofton Aff. ¶ 16.)

At around four in the afternoon on May 27, after speaking with all of Victoria's caseworkers, Crofton met with Hogan, her supervisor, to discuss the case.  (Defs. 56.1 ¶ 38; Pls. 56.1 ¶ 38; Crofton Aff. ¶ 17.)  Hogan determined that the baby should be removed on an emergency basis, when she was ready to be discharged from the hospital.  (Defs. 56.1 ¶ 39; Pls. 56.1 ¶ 39; Hogan Aff. ¶¶ 3–4.)  According to Hogan, she authorized the removal based on the fact that Victoria's service providers all shared the concern that Victoria would not be able to care for the child by herself, if the infant was discharged to Victoria.  (Defs. 56.1 ¶ 39; Pls. 56.1 ¶ 39; Hogan Aff. ¶¶ 3–4.)  Hogan therefore believed that an imminent danger to the child's life or health existed.[8]  (Defs. 56.1 ¶ 39; Pls. 56.1 ¶ 39; Hogan Aff. ¶¶ 3–4.)  There was not enough time to obtain a court order to remove J.S. because Family Court did not permit removal petitions at that time of day.  (Defs. 56.1 ¶ 40; Pls. 56.1 ¶ 40; Hogan Aff. ¶ 6; Crofton Dep. 106:13–107:5.)  Hogan authorized an ex parte removal of the child, pursuant to New York Family Court Act § 1024, when the child was ready for discharge from the hospital.  (Defs. 56.1 ¶¶ 39–40; Pls. 56.1 ¶¶ 39–40; Hogan Aff. ¶ 6.)  Hogan claims that there was not enough time to

---

[8] Plaintiffs deny that Victoria presented an imminent danger to her infant daughter's life or health.  (Pls. 56.1 ¶ 39.)

explore Victoria's parents as alternative caretakers, but, even if there was sufficient time, only Family Court had the authority to unilaterally place the infant in the grandparents' custody. (Defs. 56.1 ¶¶ 39–40; Pls. 56.1 ¶¶ 39–40; Hogan Aff. ¶ 6.)  Crofton contacted Mohini Jose, a social worker at Stony Brook Hospital, and advised her that CPS would be removing the baby. (Defs. 56.1 ¶ 46; Pls. 56.1 ¶ 46.)  The baby was in the neonatal intensive care unit.  (Defs. 56.1 ¶ 46; Pls. 56.1 ¶ 46.)  Jose told Crofton that the infant was ready for discharge but that the hospital would hold the baby until the next day, May 28, when CPS could pick up the infant.  (Defs. 56.1 ¶ 46; Pls. 56.1 ¶ 46; Crofton Aff. ¶ 21.)

On Saturday, May 28, 2005, CPS Emergency Services caseworker Michael Delgado visited Victoria and informed her of CPS's intention to take protective custody of the baby. (Defs. 56.1 ¶ 47; Pls. 56.1 ¶ 47; *see* Crofton Aff. ¶ 22.)  Delgado delivered a protective custody notice to Victoria, which did not make any reference to concerns regarding Victoria's mental health.  (Defs. 56.1 ¶ 48; Pls. 56.1 ¶ 58; VS Dep. 154:3–155:5; Defs. Ex. G.)  Victoria did not consent, and Delgado proceeded to Stony Brook Hospital, removed the baby, and placed her in a foster home.  (Defs. 56.1 ¶ 47; Pls. 56.1 ¶ 47; *see* Crofton Aff. ¶ 22.)  After Victoria received the notice, she called her parents, who drove her to Stony Brook Hospital.  (Defs. 56.1 ¶ 51; Pls. 56.1 ¶ 51.)  Delgado had already removed the baby by the time Victoria and her parents arrived. (Defs. 56.1 ¶ 51; Pls. 56.1 ¶ 51.)

On Tuesday, May 31, 2005, DSS filed a neglect petition in Family Court.  (Defs. 56.1 ¶ 52; Pls. 56.1 ¶ 52; Defs. Ex. H ("Neglect Petition").)  A preliminary hearing was held on Thursday, June 2, 2005, at which Victoria was represented by counsel.  (Defs. 56.1 ¶ 53; Pls. 56.1 ¶ 53.)  At the hearing, Victoria consented to the temporary removal of her child, and the court found that "[i]mmediate removal of the child is necessary to avoid imminent danger to

child's life or health because respondent is diagnosed with bi-polar disorder and takes a high dose of Lithium, rendering her unable to safely care for the child." (Defs. Ex. I ("June 2, 2005 Family Court Order") p.2.) The court found that it would be contrary to the best interests of the child for J.S. to live with Victoria based on the neglect petition and the testimony of the DSS caseworker. (*Id.*) The court awarded temporary custody to Victoria's parents and granted Victoria supervised visitation of the infant under conditions deemed appropriate by DSS and Victoria's parents. (Defs. 56.1 ¶ 54; Pls. 56.1 ¶ 54; June 2, 2005 Family Court Order p.5.)

On October 20, 2005, the court ordered that the petition be adjourned in contemplation of dismissal. (Defs. 56.1 ¶ 56; Pls. 56.1 ¶ 56; Defs. Ex. J ("October 20, 2005 Family Court Order").) Victoria consented to a finding of neglect, (VS Dep. 192:4–193:25, 200:11–201:25; Deposition of Irwin Schweitzer ("IS Dep.") 120:10–121:18), and did not appeal the finding of neglect. (LS Dep. at 137:19–139:3.) The October 20, 2005 Family Court Order granted joint custody of the infant to Victoria and her parents, with physical custody to Victoria's parents. (October 20, 2005 Family Court Order p.4.) Victoria was granted unsupervised visitation rights that could be arranged with her parents, and the Family Court noted that the child's father was not to be present during these visits. (*Id.*) After the court adjourned the proceedings "in contemplation of dismissal," the petition was automatically dismissed. *See* N.Y. Fam. Ct. Act § 1039; *see also Green v. Mattingly*, 585 F.3d 97, 102 (2d Cir. 2009).

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of*

*Parole*, 678 F.3d 166, 174 (2d Cir. 2012); *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011).

The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. *Rooker-Feldman* and Collateral Estoppel

As an intial matter, Defendants argue that Plaintiffs are barred from bringing this action by the *Rooker-Feldman* doctrine and the doctrine of collateral estoppel. For the reasons discussed below, the Court finds that this action is not barred by either doctrine.

### i. *Rooker-Feldman* Doctrine

Under the *Rooker-Feldman* doctrine, federal district and circuit courts lack subject-matter jurisdiction over cases that are essentially "appeals from state-court judgments." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that *Rooker-Feldman* bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"); *McKithen v. Brown*, 626 F.3d 143, 154 (2d Cir. 2010) ("[T]he *Rooker-*

*Feldman* doctrine deprives a federal court of jurisdiction to consider a plaintiff's claim" and applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review of those judgments." (internal quotation marks and citations omitted)).  "Underlying the *Rooker-Feldman* doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions." *Hoblock*, 422 F.3d at 85; *see also Williams v. 2720 Realty Co.*, No. 12 Civ. 6408, 2013 WL 55685, at *2 (E.D.N.Y. Jan. 3, 2013) ("[O]nly the United States Supreme Court is vested with jurisdiction over appeals from final state court judgments.").  In 2005, the Supreme Court limited the application of the doctrine, cautioning that it was meant to occupy a "narrow ground." *Exxon Mobil Corp.*, 544 U.S. at 284.

Since *Exxon Mobile*, the Second Circuit has limited the application of *Rooker-Feldman* to cases satisfying a four part test:  (1) the federal-court plaintiff lost in state court; (2) the plaintiff "must complain of injuries caused by a state-court judgment;" (3) the plaintiff "must invite district court review and rejection of that judgment;" and (4) "the state-court judgment must have been rendered before the district court proceedings commenced."  *Green*, 585 F.3d at 101 (alteration, citations and internal quotation marks omitted); *see also McKithen*, 626 F.3d at 154 (outlining the *Rooker-Feldman* test).  The first and fourth requirements are procedural, while the second and third are substantive.  *Green*, 585 F.3d at 101; *Hoblock*, 422 F.3d at 85.  The Court finds that Plaintiffs' claims are not barred by the *Rooker-Feldman* doctrine because Plaintiffs do not invite this Court to review and reject the state-court judgment.[9]

_____

[9] It is also not clear that Victoria is a "state-court loser" for the purposes of the *Rooker-Feldman* doctrine.  *Green v. Mattingly*, 585 F.3d 97, 102 (2d Cir. 2009) ("[T]he Rooker-Feldman doctrine applies only to federal actions brought by 'state-court losers' . . . .").  After the

Here, the *Rooker-Feldman* doctrine does not bar Plaintiffs' claims because they do not "invite district court review and rejection" of a state court judgment. *Green*, 585 F.3d at 101 (quoting *Hoblock*, 422 F.3d at 85); *see also McKnight v. Middleton*, 699 F. Supp. 2d 507, 515 (E.D.N.Y. 2010) ("The doctrine only applies where the requested federal court remedy of an alleged injury caused by a state court judgment would require overturning or modifying that state court judgment." (internal quotation marks omitted)). In the child custody context, in order to satisfy this substantive requirement, a plaintiff must "plainly" be seeking to "undo the [Family Court] judgment." *McKnight*, 699 F. Supp. at 515 (quoting *Green*, 585 F.3d at 102). In *McNamara v. Kaye*, the Second Circuit, in *dicta*, stated that claims challenging general procedures would not be barred by *Rooker-Feldman* unless they seek modification of the specific orders affecting the plaintiff. No. 08 Civ. 4561, 2009 WL 3377914, at *1 (2d Cir. Oct. 20, 2009) ("Inasmuch as [the plaintiff's] claims challenge the procedures applied in all attorney disciplinary proceedings and seek damages and prospective relief rather than a modification of

---

emergency removal, Victoria appeared in family court to respond to the removal petition. At the preliminary hearing, the parties agreed that Victoria would consent to a finding of neglect and temporary custody would be awarded to her parents but that Victoria would retain visitation rights. (June 2, 2005 Family Court Order.) Victoria was later granted joint, non-residential custody of J.S. at the final hearing. (October 20, 2005 Family Court Order.) The family court then adjourned the proceedings "in contemplation of dismissal," (*id.*), and the petition was automatically dismissed. *See* N.Y. Fam. Ct. Act § 1039; *Green*, 585 F.3d at 102. Although there was no final adjudication in Plaintiff's favor, *see* N.Y. Fam. Ct. Act § 1051 (discussing when a court shall dismiss a petition), and Plaintiff did not secure the reversal of the removal order entered against her, there was also no final "order of disposition" removing her child, *see id.* § 1052, and Victoria was satisfied with the joint custodial arrangement, (Pl. Opp'n Mem. 38–39). *See Green*, 585 F.3d at 102 ("Although there was no final adjudication in plaintiff's favor, there was also no final 'order of disposition' removing her child, and plaintiff secured the reversal of the one form of interlocutory relief entered against her." (internal citations omitted)). Plaintiffs do not challenge Victoria's loss of sole custody of J.S. Rather, they object to the emergency removal of J.S. Since the Court finds that Plaintiffs do not invite the Court to review and reject a state court judgment, the Court does not decide whether loss of certain custodial rights is sufficient to make Victoria a state-court loser under the *Rooker-Feldman* doctrine.

her suspension or reinstatement orders, her claims would not appear to be barred by *Rooker-Feldman*."); *see also McKnight*, 699 F. Supp. 2d at 515 ("*McNamara* and *Green* . . . suggest that a plaintiff's claims seeking only monetary damages or prospective-only relief against court procedures rather than modification of a family court's temporary custody or other orders would not run afoul of the *Rooker-Feldman* doctrine."); *Dowlah v. Dowlah*, No. 09 Civ. 2020, 2010 WL 889292, at *2 (E.D.N.Y. Mar. 10, 2010) (same).

Plaintiffs' claims do not seek to undue any family court order. Victoria was satisfied with the joint custodial arrangement. (Pl. Opp'n Mem. 38–39 (stating that once Victoria received joint custody with unlimited visitation rights, "Victoria had no practical reason" to appeal).) Plaintiffs are challenging the emergency removal of J.S. from Stony Brook Hospital on May 28, 2005, not the June 2, 2005 Family Court Order placing J.S. in the temporary custody of Victoria's parents under DSS supervision or the October 20, 2005 Family Court Order granting Victoria and her parents joint custody and adjourning the proceedings in contemplation of dismissal. Although at the June 2, 2005 preliminary hearing, the court found that "immediate removal of [J.S] is necessary to avoid imminent danger to child's life or health," this ruling did not address whether DSS had a sufficient basis to seize J.S. on May 28, 2005, prior to court intervention. [10] (Declaration of Carolyn Wolf ("Wolf Decl.") ¶ 5.) DSS's authority to make this

---

[10] Once a court has ordered the removal of a child, a plaintiff cannot circumvent the *Rooker-Feldman* doctrine simply by filing her claims against the caseworkers who act in compliance with a court order, rather than directly challenging the court order. *See Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005) ("[I]f the state has taken custody of a child pursuant to a state judgment, the parent cannot escape *Rooker–Feldman* simply by alleging in federal court that he was injured by the state employees who took his child rather than by the judgment authorizing them to take the child."). In this case, for example, if Plaintiffs complained of J.S.'s removal after June 2, 2005, those claims would be barred by the *Rooker-Feldman* doctrine because of the family court order that removal of J.S. was warranted.

emergency removal was permissible by statute, N.Y. Family Court Act § 1024, but was certainly not authorized by *any* court order.

Since the Supreme Court's decision in *Exxon*, neither the Supreme Court nor the Second Circuit has directly addressed the application of the *Rooker-Feldman* doctrine to challenges of an emergency removal, where the family court ultimately concluded that removal was warranted. However, the Second Circuit held prior to *Exxon* that although "the *Rooker–Feldman* doctrine precludes federal court review of the New York state family court decisions subsequent to the seizure of [the plaintiff's] children, . . . it does not prevent a federal court from hearing claims that the plaintiff's constitutional rights were violated *prior* to the family court proceedings by the state's alleged failure to provide a pre-deprivation hearing or a prompt post-deprivation hearing, or *by the allegedly unreasonable seizure of the children*." *Southerland v. Giuliani*, 4 F. App'x 33, 37 (2d Cir. 2001) (emphasis added); *see Southerland v. City of New York*, 521 F. Supp. 2d 218, 228 n.23 (E.D.N.Y. 2007) (relying on the Second Circuit's 2001 opinion that *Rooker-Feldman* does not bar constitutional challenges arising out of the emergency removal of a child), *vacated on other grounds*, 680 F.3d 127 (2d Cir. 2012); *see also Shapiro v. Kronfeld*, No. 00 Civ. 6286, 2004 WL 2698889, at *11 (S.D.N.Y. Nov. 24, 2004) ("[A] general conclusion that continued removal is warranted 'cannot constitute a specific finding that caseworkers lacked reasonably sufficient time to obtain a court order prior to seizing the children from school.'" (quoting *Velez v. Reynolds*, 325 F. Supp. 2d 293, 306 (S.D.N.Y. 2004))). While *Exxon* abrogated much of the Second Circuit case law on *Rooker-Feldman*, *Exxon* overturned the Second Circuit's *Rooker-Feldman* standard as too broad, *Green*, 585 F.3d at 101, and in *Southerland*, the Second Circuit concluded that, even under the broad standard, *Rooker-Feldman* did not apply to these

circumstances.  There is no reason for this Court to conclude that the Second Circuit's reasoning in *Southerland* does not survive *Exxon*.

Some courts have found that the *Rooker-Feldman* doctrine prevents a plaintiff from challenging an emergency removal if the family court ultimately concluded that the removal was warranted, "because in the context of an emergency child custody removal, judicial action is a *prerequisite* to effectuate a valid removal of a child from her parent."  *J.R. ex rel. Blanchard v. City of New York*, No. 11 Civ. 841, 2012 WL 5932816, at *7 (E.D.N.Y. Nov. 27, 2012) (emphasis in original) (alterations and internal quotation marks omitted); *see also Phillips ex rel. Green v. City of New York*, 453 F. Supp. 2d 690, 716–17 (S.D.N.Y. 2006) (holding that, "although [the plaintiffs] do not state explicitly that they are challenging the state court judgment, in substance they are" because "that judicial action was a prerequisite to effectuate a valid removal of a child from her parents").  The courts in *Phillips* and *Blanchard* reasoned that, in the hearing following the emergency removal, the family court must find the removal was warranted, otherwise the child will be returned.  *Blanchard*, 2012 WL 5932816, at *7; *Phillips*, 453 F. Supp. 2d at 717.  Therefore, the courts conclude, the family court's order of removal is the cause of the relevant injuries.  *Blanchard*, 2012 WL 5932816, at *7; *Phillips*, 453 F. Supp. 2d at 717.

Although at the June 2, 2005 hearing following J.S.'s emergency removal the family court judge found that removal was warranted, the family court judge did not find that the circumstances *prior* to the hearing were so dire as to justify an emergency removal, the basis of Plaintiffs' claims.  As discussed in Part II(c)(i) below, an emergency removal is only warranted if Defendants did not have sufficient time, consistent with J.S.'s safety, to seek and obtain court

authorization for the removal.[11]  *See* N.Y. Fam. Ct. Act § 1024.  This distinction served as the basis for the Second Circuit's finding that the *Rooker-Feldman* doctrine did not apply in *Southerland*, and the Court is not persuaded by the logic in *Phillips* and *Blanchard* that this distinction should be eliminated.

Since the family court did not decide whether sufficiently exigent circumstances justified a pre-hearing removal, the constitutionality of the initial removal of J.S. from Stony Brook Hospital was not decided by the family court, and, therefore, a decision in Plaintiffs' favor would not "require overturning or modifying that state court judgment."  *McKnight*, 699 F. Supp. 2d at 515.  The Court therefore finds that Plaintiffs' constitutional claims based *solely* on whether

---

[11] Defendants argue that this case is similar to *J.R. by Blanchard v. City of New York*, No. 11 Civ. 841, 2012 WL 5932816 (E.D.N.Y. Nov. 27, 2012), in which the court found that the *Rooker-Feldman* doctrine applied.  The Court disagrees.  In *Blanchard*, the plaintiff brought an action on behalf of herself and her infant daughter challenging the removal of the infant and her placement in foster care.  *Id*. at *1.  The family court initially heard a petition for neglect filed by the Administration for Children's Service ("ACS") against the plaintiff and concluded that "the safety issues" could be addressed by plaintiff's "strict compliance" with a series of conditions that the court set forth in its order.  *Id*. at *2.  The next day, ACS again appeared in family court, having conducted an emergency removal of the plaintiff's three minor children, including the infant, based on new information and the plaintiff's failure to comply with the conditions set forth in the court's initial order.  *Id*. at *3.  The court placed the minor children in the custody of ACS.  *Id*.  Nineteen days later, the court ordered the continued removal of the children.  *Id*.  Almost one year later, the family court issued an "Order of Disposition" placing the children in the custody of ACS and establishing certain conditions that the parent-plaintiff was required to comply with.  *Id*.  Eight months later, the plaintiff regained the custody of the infant.  *Id*. at *4.  The district court in *Blanchard* held that the parent-plaintiff's injuries were caused by the state court judgment primarily because the emergency removal occurred *after* the plaintiff failed to comply with conditions set forth in the family court's initial order.  *Id*. at *6.  The court found that the "family court order was sufficiently specific so as to grant ACS the authority to remove [the infant] from [the plaintiff's] custody" should the plaintiff violate the conditions.  *Id*.  Here, the emergency removal occurred *prior* to any family court proceeding, not pursuant to a court order, and therefore *Blanchard* is distinctly different from this case.  The district court in *Blanchard* went on to hold that, "[e]ven assuming . . . that the City Defendants acted not pursuant to the family court's initial order, but on information that emerged after the [initial] hearing, the court would still conclude that the relevant injuries arose out of the state court judgment."  *Id*. at *7.  As discussed above, this Court is not convinced that a subsequent order finding that removal is warranted is necessarily a judgment that the removal *prior* to court intervention was warranted.

sufficiently exigent circumstances existed to justify an *emergency* removal are not barred by the *Rooker-Feldman* doctrine. The Court agrees with the Tenth Circuit that where the focus of a lawsuit is on the defendants' actions taken *before* any judicial involvement and plaintiffs do not claim any injury from subsequent court rulings and do not seek to undo any aspect of those rulings, the lawsuit potentially implicates the collateral estoppel doctrine, not *Rooker-Feldman*. *Silvan W. v. Briggs*, 309 F. App'x 216, 221 (10th Cir. 2009).

### ii. Collateral Estoppel

Defendants argue that Plaintiffs' claims are barred by collateral estoppel because "the identical issue of whether the child was in imminent danger was actually decided by the Family Court." (Defs. Reply Mem 22.) Even if a claim does not "precisely fit" the *Rooker-Feldman* requirements, the claim may still be barred under ordinary preclusion principles, such as collateral estoppel. *In re Dayton*, 786 F. Supp. 2d 809, 818 n.8 (S.D.N.Y. 2011). The doctrine of collateral estoppel "bars relitigation of a specific legal or factual issue in a second proceeding where (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was a full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *White v. White*, No. 12 Civ. 200, 2012 WL 3041660, at * 15 (S.D.N.Y. July 20, 2012) (quoting *Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001)). "The collateral estoppel doctrine is generally applicable to cases brought under 28 U.S.C. § 1983." *Providencia V. v. Schutlze*, No. 02 Civ. 9616, 2007 WL 1582996, at *4 (S.D.N.Y. May 31, 2007).

Plaintiffs contest the existence of "emergency circumstances" sufficient to justify the removal of J.S. without prior judicial authorization. They do not contest the removal itself or Victoria's loss of sole custody. As discussed above, the Family Court's orders did not explicitly

address "whether there was a sufficient basis to seize [J.S.] prior to a hearing," and, therefore, "Plaintiffs' claims as to the constitutionality of the initial seizure were not actually decided by the Family Court at the preliminary hearing or at any of the subsequent court proceedings." *Shapiro*, 2004 WL 2698889, at *11 (quoting *Velez*, 325 F. Supp. 2d at 306). The Court finds that Plaintiffs claims' are not barred by collateral estoppel.[12]

### c. Plaintiffs' § 1983 Claims

Pursuant to 42 U.S.C. § 1983, Plaintiffs assert that Defendants[13] violated the following constitutional rights: (1) Victoria's and J.S.'s procedural due process rights under the Fourteenth Amendment, (2) Victoria's substantive due process rights under the Fourteen Amendment, and (3) J.S.'s right to be free from unlawful seizure under the Fourth Amendment.

### i. Procedural Due Process

Plaintiffs assert a procedural due process claim on behalf of Victoria and J.S. against Defendants. In order to establish a procedural due process claim, a plaintiff must prove: (1) a "protected property or liberty interest," (2) defendants' denial of that interest, and (3) evidence that the denial was effected "without due process." *Palacio v. Pagan*, 345 F. App'x 668, 669 (2d Cir. 2009) (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 285–86 (2d Cir. 2001)). Parents have "a constitutionally protected liberty interest in the care, custody, and management of their children," *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (collecting cases), and "children have a parallel constitutionally protected liberty interest in not being dislocated

---

[12] Defendants' argument that Plaintiffs cannot contest the finding of neglect due to the stipulation is irrelevant to a determination of whether or not Plaintiffs' claims are barred by the doctrine of collateral estoppel. As discussed above, Plaintiffs' claims challenge the existence of emergency circumstances justifying an emergency removal of J.S. from Stony Brook Hospital, not the finding of neglect.

[13] Plaintiffs seek to add Elizabeth Hogan as a defendant in this action. The Court will therefore analyze Plaintiffs' proposed claims against Hogan as well.

from the emotional attachments that derive from the intimacy of daily family association." *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) (internal citations, quotation marks, and alterations omitted).  Therefore, as a general rule, "before parents may be deprived of the care, custody, or management of their children without their consent, due process — ordinarily a court proceeding resulting in an order permitting removal — must be accorded to them." *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (quoting *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003)), *reh'g en banc denied*, 681 F.3d 122 (2d Cir. 2012), *cert. denied*, 568 U.S. ---, 133 S. Ct. 980 (2013).  In emergency circumstances, however, a child may be taken into custody "by a responsible State official without court authorization or parental consent." *Id.* (quoting *Nicholson*, 344 F.3d at 171).  "If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent." *Id.* (quoting *Nicholson*, 344 F.3d at 171); *see also Tenenbaum,* 193 F.3d at 596 ("[W]here there is reasonable time consistent with the safety of the child to obtain a judicial order, the 'emergency' removal of a child is unwarranted.").

To show that emergency circumstances existed, "[t]he government must offer 'objectively reasonable' evidence that harm [was] imminent." *Southerland*, 680 F.3d at 149 (alteration in original) (quoting *Nicholson*, 344 F.3d at 171).  The Second Circuit has stated that these circumstances include the "risk that children will be 'left bereft of care and supervision'" and "immediate threat[s] to the safety of the child." *Southerland*, 680 F.3d at 149 (citations omitted); *see also* N.Y. Fam. Ct. Act § 1024(a) (defining emergency circumstances, for the purposes of state law, as "circumstance[s]" wherein a child remaining in the parent's care and custody "presents an imminent danger to the child's life or health").  If at any time a child must

be removed for his or her protection and there is not "reasonably sufficient time to seek predeprivation judicial authorization," there would not be, as a matter of law, any violation of due process rights. *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003); *see also Cornejo v. Bell*, No. 04 Civ. 0341, 2008 WL 5743934, at \*8 (E.D.N.Y. May 19, 2008) (quoting *Tenenbaum*, 193 F.3d at 595), *aff'd*, 592 F.3d 121 (2d Cir. 2010).

Here, the parties dispute whether emergency circumstances existed at the time of removal. At the time of removal, Defendants were in possession of the following information: (1) hospital records indicating that staff members had witnessed at least two occasions in which Victoria became excessively alarmed and panicked while with the child, including one occasion where she began to cry with the child (Crofton Aff. ¶¶ 3–4); (2) statements from CIL staff members that Victoria slept heavily due to her medications, that she was unresponsive to their calls and attempts to reach her, and that they were concerned about Victoria's ability to care for the infant alone (*id.* at ¶ 13); (3) information that a CIL worker would be unable to visit Victoria until after the holiday weekend (*id.* at ¶ 13); and (4) statements from ACT team members that they were "very concerned" about Victoria's ability to care for the child since she had just been released from the hospital, had a history of psychiatric instability, and wanted to stay on a lower dosage of her psychiatric medication, which may have affected her stability (*id.* at ¶¶ at 15–16; Banovich Dep. 127:16–129:25). Once Crofton obtained all of the necessary information from collateral sources, which occurred at approximately 4:00 p.m. on Friday, May, 27, 2005, she met with her supervisor, Assistant Director Elizabeth Hogan. (Defs. 56.1 ¶ 38; Pls. 56.1 ¶ 38.) Since Victoria's service providers "all shared concerns that if the child were discharged to [Victoria], . . . she would not be able to care [for] the child by herself," Director Hogan determined that Victoria's potential inability to care for J.S. alone "presented an imminent

danger to the child's life or health." (Hogan Aff. ¶ 4.) Thus, she authorized the removal of J.S., when J.S. was ready for discharge from the hospital. (*Id*.) The parties agree that at the time Hogan authorized J.S.'s removal, there was not enough time to seek judicial authorization. (Defs. 56.1 ¶¶ 39–40; Pls. 56.1 ¶¶ 39–40.)

Plaintiffs argue that Crofton knew Victoria would be staying with her parents after J.S.'s release, and, therefore, despite any concerns regarding Victoria's ability to care for J.S. over the holiday weekend, no emergency circumstances existed.[14] Plaintiffs point to Linda Schweitzer's affidavit in which she states that she informed Crofton that Victoria was staying with her parents while she recuperated. (Reply Affidavit of Linda Schweitzer ("L.S. Reply Aff.") ¶¶ 3–6.) Defendants argue that Linda Schweitzer's affidavit is contradicted by Croton's affidavit, which

---

[14] Plaintiffs also argue that no emergency circumstances existed, as Stony Brook Hospital could have held J.S. until DSS could seek judicial authorization. (Pls. Opp'n Mem 27–28.) If the hospital held J.S. after J.S. was medically ready for release, the hospital's action would constitute a removal. Under New York law, a hospital may hold a child after the child no longer needs medical treatment if there is "reasonable cause" to believe that continuing the child's current place of residence, under the child's current guardian, presents an imminent danger to the child's life or health. N.Y. Soc. Serv. Law § 417. The hospital is required to immediately notify the appropriate local child protective service which is required to immediately begin an investigation. *Id*. Thus, while Plaintiff is correct that the hospital could have held J.S. if it felt J.S. was in danger, the hospital would have been required by law to call child protective services. Furthermore, if the hospital had held J.S. for DSS, instead of releasing her into DSS's custody or into Victoria's custody, the hospital's action would implicate New York State authority, and Plaintiffs could potentially have had a constitutional claim against the hospital. *See Kia P. v. McIntyre*, 235 F.3d 749, 760 (2d Cir. 2000) (holding that hospital was acting "for the State" when it held infant for an additional day or two after she was medically cleared out of concern for her safety, the hospital's actions effectuated a removal, and that removal was evaluated under the same standards as if the state itself had removed the child from the hospital); *Cecere v. City of New York*, 967 F.2d 826, 830 (2d Cir. 1992) (holding that where a parent voluntarily left her child with a third party, and the third party later refused to return the child to the parent on the basis of State authority, the parent was deprived of her constitutionally protected interest in the custody of her child at the moment the third party refused to return the child); *Denes Q. v. Caesar*, No. 07 Civ. 1281, 2011 WL 4434224, at *8–9 (E.D.N.Y. Sept. 22, 2011) (stating that hospital defendants were "state actors capable of violating plaintiffs' constitutional rights when they detained" the child due to a request from child services).

states that Linda Schweitzer told Crofton that Victoria would be going home on Thursday, May 26, 2005, before J.S. was released from the hospital. (Crofton Aff. at ¶¶ 7, 11.) Defendants also argue that Linda Schweitzer's affidavit is contradicted by Linda Schweitzer's own deposition testimony and should be disregarded to the extent that it does. (Defs. Reply Mem 7.) Plaintiffs argue that Linda Schweitzer's statements can be reconciled, and, therefore, the statement in her affidavit should be accepted as true for the purposes of this motion. (Pls. Reply Mem 8–9.)

Even assuming that Linda Schweitzer did tell Crofton that Victoria would be staying with her parents over the weekend or while she recuperated, that information was contradicted by all the other information available to Crofton. The State Central Registry report indicated that J.S. would be residing alone with her mother, (Defs. 56.1 ¶ 24; Pls. 56.1 ¶ 24), and CIL staff members indicated that, although the grandparents were thinking of visiting, the baby would be staying alone with Victoria. (Defs. 56.1 ¶ 34; Pls. 56.1 ¶ 34.) Victoria herself told Crofton that she was able to live independently and that once J.S. was discharged, her mother would "visit her in the beginning but [would] not be staying in her home." (Defs. 56.1 ¶ 32; Pls. 56.1 ¶ 32; Crofton Aff. ¶ 11.)[15] Nurse Rada Vukcevic, an ACT team nurse familiar with Victoria's psychiatric history, told Crofton that Victoria was easily agitated, did not deal well with her parents, and did not like her parents giving her orders. (Defs. 56.1 ¶ 37; Pls. 56.1 ¶ 37.)

Even if the parents did plan to have Victoria and J.S. stay at the parents' home for the weekend, without removal, there were no safeguards in place to prevent Victoria from taking J.S. home the night J.S. was discharged. *See Cornejo v. Bell*, No. 04 Civ. 0341, 2008 WL 5743934, at *9 (E.D.N.Y. May 19, 2008) (holding there was no procedural due process violation because,

---

[15] Plaintiffs dispute this statement to the extent that it implies that Victoria intended to convey that she and J.S. would immediately move to Victoria's apartment upon discharge of J.S. (Pls. 56.1 ¶ 32; LS Aff. ¶ 16.)

though the child was staying with relatives at the time of removal, "there was nothing to prevent [the child's parents] from picking [the child] back up from the relatives that very night"), *aff'd*, 592 F.3d 121 (2d Cir. 2010). Based on the facts of this case, there was sufficient "objectively reasonable" evidence that Victoria could not care for J.S. by herself and therefore presented a "danger to the child's life or health." Thus, no rational jury could find, without impermissibly speculating, that at the time DSS removed J.S., there was time, entirely consistent with J.S.'s safety, to seek a court order.[16] The Court finds that Plaintiffs have failed to establish a violation of the procedural due process rights of Victoria or J.S. Defendants' motion for summary judgment is granted as to this claim, and Plaintiffs' motion for summary judgment is denied.

---

[16] Plaintiffs maintain that it was highly unlikely that Victoria would have left her parents' house with J.S. at any point that weekend, and therefore there was no emergency. (Oral Arg. Tr. 26:1–17.) Even if the Court was persuaded by Plaintiffs' argument, Hogan and Crofton were objectively reasonable in concluding otherwise. Qualified immunity protects public officials, including caseworkers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)), *reh'g en banc denied*, 681 F.3d 122 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 980 (2013). Generally, "public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Id.* (quoting *Holcomb v. Lykens*, 337 F.3d 217, 220 (2d Cir. 2003)). Objective reasonableness is established "if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Id.* (internal quotation marks omitted) (quoting *Manganiello v. City of N.Y.*, 612 F.3d 149, 165 (2d Cir. 2010)). Since Crofton and Hogan were objectively reasonable in concluding that J.S.'s safety required removing J.S. upon release from the hospital, rather than waiting until the following week for judicial authorization, Crofton and Hogan are entitled to qualified immunity. *See Tenenbaum v. Williams*, 193 F.3d 581, 596–97 (2d Cir. 1999) ("[P]rotective services caseworkers [must] choose between difficult alternatives. . . . If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives . . . ." (alterations in original) (quoting *Van Emrik v. Chemung Cnty. Dep't of Soc. Servs*, 911 F.2d 863, 866 (2d Cir. 1990))).

### ii. Substantive Due Process

Plaintiffs, on behalf of Victoria's estate, assert a substantive due process claim against Defendants.[17]  "Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective."  *Southerland*, 680 F.3d at 151 (internal quotation marks ommited) (quoting *Tenenbaum*, 193 F.3d at 600).  In order to prevail on a substantive due process claim, Plaintiffs must show that (1) Victoria had an actual interest at stake, and (2) Defendants infringed on that interest in a manner that was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Id.*  (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 431 (2d Cir. 2009)).  Parents have a "substantive right under the Due Process Clause 'to remain together [with their children] without the coercive interference of the awesome power of the state.'"  *Tenenbaum,* 193 F.3d at 600 (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977)); *see also Southerland*, 680 F.3d at 142; *Kia P.,* 235 F.3d at 757–58.  While a procedural due process claim challenges the procedure by which a removal is effected, a substantive due process claim challenges the "fact of [the] removal" itself.  *Bruker v. City of New York*, 92 F.Supp.2d 257, 266–67 (S.D.N.Y. 2000).

---

[17] Plaintiffs also appear to assert a substantive due process claim on behalf of J.S. (Compl. ¶¶ 95, 97 (asserting violations of Victoria and J.S.'s substantive due process rights).) However, "[w]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process."  *Southerland*, 680 F.3d at 142 (quoting *Kia P.*, 235 F.3d at 757–58).  "For child removal claims brought by the child, . . . the Constitution provides an alternative, more specific source of protection than substantive due process.  When a child is taken into state custody, his or her person is 'seized' for Fourth Amendment purposes.  The child may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was 'unreasonable.'"  *Id.* at 142–43.  Because J.S. can maintain a Fourth Amendment claim, she cannot assert an additional substantive due process claim and any such claim is dismissed.  The Court will only address Plaintiffs' substantive due process claim on behalf of Victoria.

Brief removals of a child "generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal.'" *Southerland*, 680 F.3d at 153 (quoting *Nicholson,* 344 F.3d at 172). Once such "court confirmation of the basis for removal" is obtained, "any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." *Id*. (citation and internal quotation marks omitted). Here, undisputed evidence establishes that Defendants filed a neglect petition in family court three days after the removal of J.S. and a post-removal judicial hearing was held within six days, three business days, after removal.[18] A six-day separation does not constitute a violation of Victoria's substantive due process rights. *See, e.g, E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 368 (S.D.N.Y. 2010) (no substantive due process violation where children were removed on a Friday evening, and judicial proceedings commenced in a timely manner on the following Monday), *aff'd sub nom., E.D. ex rel. Demtchenko v. Tuffarelli*, 408 F. App'x 448 (2d Cir. 2011); *Green ex rel. T.C. v. Mattingly*, No. 07 Civ. 1790, 2010 WL 3824119, at *10 (E.D.N.Y. Sept. 23, 2010) (four-day removal of child during ACS investigation did not violate substantive due process).

Plaintiffs concede that a separation of less than a week does not give rise to a substantive due process violation. (Pls. Opp'n Mem 41.) Plaintiffs argue instead that the removal of J.S. resulted in a period of separation of over five months as family court and DSS attempted to resolve the issue of permanent placement. (*Id*. at 41–42.) However, any removal that occurred following the June 2, 2005 hearing is not attributable to Defendants. *Southerland*, 680 F.3d at

---

[18] J.S. was removed Saturday, May 28, 2005, Memorial Day weekend, and a petition was filed on Tuesday, May 31, 2005, the first business day after removal. (Defs. 56.1 ¶¶ 47, 52–53; Pls. 56.1 ¶¶ 47, 52–53.)

154 (finding that, where plaintiffs conceded that a post-removal judicial proceeding was held and that it took place within four days after removal, only the four days of removal prior to the court hearing were attributable to the caseworker).  Plaintiffs' argument to the contrary is unpersuasive.  Plaintiffs argue that the June 2, 2012 Family Court Order "cannot be said to be the type of ratification of the removal decision that eliminates Victoria and [J.S.]'s substantive due process claim," because witnesses were not cross-examined and no medical expert testified at the hearing.  (Pls. Opp'n Mem. 42.)  Plaintiffs have provided no relevant legal support for this argument.[19]  These claims are clearly challenges to the sufficiency of the procedures provided by the family court and not the deprivation of Victoria's substantive due process rights.  *See Bruker v. City of New York*, 92 F. Supp. 2d 257, 266–67 (S.D.N.Y. 2000) (holding that the plaintiff's complaint regarding removal procedures was a procedural one and did not implicate the plaintiff's substantive right to "family integrity").  Moreover, as discussed above, if Plaintiffs seek to challenge J.S.'s removal after the June 2, 2012 Family Court Order, that challenge would be barred by the *Rooker-Feldman* doctrine.  *See supra* Part II(b)(1).  Plaintiffs' substantive due process claim on behalf of Victoria has no merit.  Defendants' motion for summary judgment as to this claim is granted.

### iii.  Unlawful Seizure

Plaintiffs claim that Defendants violated J.S.'s Fourth Amendment rights by removing her from the custody of Victoria when J.S. was not in immediate danger.  (Pls. Opp'n Mem. 30–

---

[19] Plaintiffs cite to *Addington v. Texas*, 441 U.S. 418, 429 (1979), for the idea that "a fair and reasoned decision will require examination and testimony from mental health experts."  (Pls. Opp'n Mem 42.)  In *Addington*, the Supreme Court addressed the standard of proof in involuntary civil commitment cases, where a civil petition has been filed requesting that a mentally ill individual be indefinitely and involuntary committed to a state psychiatric hospital.  Plaintiffs have offered no explanation as to why that standard should be applied in the context of a child removal hearing in family court.

32.)  The Fourth Amendment prohibits "unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . .  the persons or things to be seized."  U.S. CONST. amend. IV.  When a child is taken into state custody, "his or her person is 'seized' for Fourth Amendment purposes," and the child "may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was 'unreasonable.'"  *Southerland*, 680 F.3d at 143; *Kia P.*, 235 F.3d at 762 (2d Cir. 2000) ("We have observed that the Fourth Amendment applies in the context of the seizure of a child by a government-agency official during a civil child-abuse or maltreatment investigation."); *Tuffarelli,* 692 F.Supp.2d at 366 (S.D.N.Y.2010) ("The removal of a child, even on a temporary basis, may constitute a 'seizure' for the purpose of the Fourth Amendment's prohibition against unlawful search and seizure." (quoting *Tenenbaum*, 193 F.3d at 605)).

The Second Circuit "has yet to articulate definitively the legal standard that applies to a Fourth Amendment unlawful-seizure claim brought by a child alleging that his or her removal without parental consent or prior judicial authorization was not supported by sufficient cause."[20] *Southerland*, 680 F.3d at 157.  It is well established, however, that at least where information possessed by a state officer would "warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed" before court authorization can reasonably be obtained, the "exigent circumstances" doctrine permits removal of the child "without a warrant equivalent and without parental consent."  *Southerland,* 680 F.3d at 158 (internal quotation marks omitted) (quoting *Tenenbaum,* 193 F.3d at 60–61); *Pezzenti v. Capaldo*, No. 03

---

[20] The Second Circuit has considered three possible standards:  (i) the traditional probable-cause standard applicable in the law enforcement context; (ii) a less stringent "special needs" reasonable-cause standard; and (iii) the "exigent-circumstances" standard for warrantless searches.  *Tenenbaum*, 193 F. 3d at 603–604; *see also Southerland*, 680 F.3d at 157-58; *Kia P.*, 235 F.3d at 762.

Civ. 419, 2004 WL 2377241, at * 5 (D. Conn. Sept. 23, 2004) ("Because probable cause, reasonable cause and exigent circumstances justified [the child's] immediate removal from the . . . home pending evaluation by [child services], his removal complied with Fourth Amendment requirements despite the absence of a court order or consent.").

The existence of emergency circumstances sufficient to justify removal of a child without prior judicial authorization in a manner consistent with their procedural due process rights is also sufficient to "justify [the child's] removal in a manner comporting with [her] Fourth Amendment rights barring unreasonable seizure." *Southerland*, 680 F.3d at 161; *see also Tuffarelli*, 692 F. Supp. 2d at 366 ("Whatever Fourth Amendment analysis is employed," in the child-removal context, "it results in a test for present purposes similar to the procedural due-process standard." (quoting *Tenenbaum*, 193 F.3d at 605)); *Shapiro,* 2004 WL 2698889, at *17 (the test for identifying a Fourth Amendment violation in a child-removal case "is similar to the procedural due process standard"). As discussed in Part II(c)(i) above, Defendants have established that they had a reasonable basis to conclude that exigent circumstances justified J.S.'s removal. Therefore, Defendants' motion for summary judgment is granted as to this claim, and Plaintiffs' motion for summary judgment is denied.

### iv.  Municipal Liability

Plaintiffs' claim against the Suffolk County Department of Social Services must be dismissed because it is not a suable entity.  *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) ("In New York, agencies of a municipality are not suitable entities" because "[u]nder New York law, departments that are merely administrative arms of a municipality have no separate legal identity apart from the municipality and therefore cannot be sued." (internal quotation marks omitted)); *see also George v. Grace Church Cmty.*

*Ctr.,* No. 10 Civ. 5343, 2012 WL 859703, at *2 (S.D.N.Y. Feb. 17, 2012) (dismissing DSS

because it is not a suable entity); *In re Dayton*, 786 F. Supp. 2d 809, 818 (S.D.N.Y. 2011) ("DSS

is not a suable entity."); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y.

1999) ("[M]unicipal departments like the Department of Social Services are not amenable to suit,

and no claims lie directly against the Department." (citations omitted)).

Plaintiffs recognize this and seek to substitute Suffolk County as a defendant to allege a

*Monell* claim for failure to train DSS caseworkers.[21]  (Pls. Opp'n Mem 18–21.)  However,

having found that Plaintiffs have not established a constitutional violation, Plaintiffs cannot

sustain a claim against Suffolk County.  *See Segal v. City of New York*, 459 F.3d 207, 219 (2d

Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government

to train its employees; it *extends* liability to a municipal organization where that organization's

failure to train, or the policies or customs that it has sanctioned, led to an independent

constitutional violation." (emphasis in original)); *Mendoza v. County of Nassau*, No. 11 Civ.

2487, 2012 WL 4490539, at *7 (E.D.N.Y. Sept. 27, 2012) ("When there is no underlying

constitutional violation, there can be no municipal liability under *Monell*.").  An amendment to

substitute Suffolk County as a defendant would be futile, and, therefore, Plaintiffs' motion to

amend the Complaint to add Suffolk County is denied.

### d.  ADA and Rehabilitation Act Claims

Plaintiffs bring a disability discrimination claim on behalf of Victoria pursuant to Title II

of the ADA and § 504 of the Rehabilitation Act, both of which prohibit discrimination based on

disability.  *See Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (Title

II of the ADA protects qualified individuals with a disability from being "excluded from

---

[21] *See Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978).

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" by "reason of such disability." (citing 42 U.S.C. § 12132)); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (stating that "[a]lthough there are subtle differences between [the ADA and the Rehabilitation Act] the standards adopted . . . by [them] are generally the same[.]" (citation omitted)).  Title II and the Rehabilitation Act claims include claims for intentional discrimination, disparate impact, and failure to accommodate.  *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) ("A qualified individual can base a discrimination claim on any of 'three available theories:  (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'" (quoting *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003))).

As Judge Hurley held in his September 1, 2010 decision, in order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that: (1) he or she is a qualified individual with a disability; (2) that the defendant is subject to the ADA; and (3) that plaintiff was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities."  *Schweitzer ex rel. Schweitzer v. Crofton*, No. 08 Civ. 135, 2010 WL 3516161, at *14 (E.D.N.Y. Sept. 1, 2010) (quoting *Henrietta D. v. Bloomberg,* 331 F.3d 262, 272 (2d Cir. 2003)); s*ee also Noel*, 687 F.3d at 68 (listing requirements); *Fredricks v. City of New York*, No. 12 Civ. 3734, 2013 WL 839584, at *3 (S.D.N.Y. Mar. 6, 2013) (same).  These requirements apply with equal force to Rehabilitation Act claims.[22]  *Hargrave v. Vermont*, 340

_____

[22] "To establish a prima facie case under the Rehabilitation Act, a plaintiff must allege: [1] that he or she is a person with disabilities under the Rehabilitation Act, [2] who has been denied benefits of or excluded from participating in a federally funded program or special

F.3d 27, 35 (2d Cir. 2003).  Additionally, to establish a violation under the Rehabilitation Act, a plaintiff must show that the benefit is part of a "program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

Plaintiffs argue that Defendants made assessments and conclusions of Victoria's fitness to care for J.S. based on stereotypical views of individuals with mental illness.  (Pls. Opp'n Mem. 35–36; Pls. Reply Mem. 14–17.)  Consideration of Victoria's disability, standing alone, is not a violation of the ADA.  *Ward v. Murphy,* 330 F. Supp. 2d 83, 98–99 (D. Conn. 2004) (holding that child services did not violate the ADA by considering parent's mental disability in determining whether child should remain in his home).  The issue is whether DSS discriminated against Victoria because of her disability.  *Id.*; *see Henrietta D.*, 331 F.3d at 272 (holding that in order to establish a Title II violation, plaintiff must show that he was "*by reason of such disability*, . . . excluded from participation in, or . . . denied the benefits of the services, programs, or activities of a public entity, or . . . subjected to discrimination by any such entity" (emphasis added)); *see also Bolmer v. Oliveira*, 594 F.3d 134, 148 (2d Cir. 2010) (questioning whether, in order to show Title II discrimination, plaintiff must show disability was motivating factor or the "but-for" cause of the allegedly discriminatory action).

There is no evidence that Defendants' decision to remove J.S. was impermissibly based on Victoria's disability.  DSS did not get involved in this matter until they received the second referral from the hospital.  Following the second referral, Crofton conducted a careful and thorough investigation regarding Victoria's past medical and personal history and Victoria's behavior at the hospital.  Crofton and Hogan then evaluated the information presented to them by a number of different people who are specialists in their field.  In addition to the healthcare

---

service, [3] solely because of his or her disability."  *Bryant v. New York State Educ. Dept*., 692 F.3d 202, 216 (2d Cir. 2012).

workers at the hospital, Defendants obtained information from the CIL and ACT team members, individuals who based their concerns and recommendations on their teams' years of experience working with Victoria – her conduct, behavior, and history of noncompliance with psychiatric treatment.  (Def. 56.1 ¶¶ 5–6; Pls. 56.1 ¶¶ 5–6; VS Dep. 30:6–13.)  It was reasonable for Defendants to rely on information presented by Victoria's service providers and treating medical professionals in making the removal determination.  *See Harley ex rel. Johnson v. City of New York*, 36 F. Supp. 2d 136, 141 (E.D.N.Y. 1999) (holding that it was objectively reasonable for caseworker to rely on physician), *aff'd sub nom.*, *Harley v. City of New York*, 208 F.3d 203 (2d Cir. 2000); *c.f. Spencer v. Lavoie*, 986 F. Supp. 717, 722 (N.D.N.Y. 1997) (finding no "requirement in the case law that a child protective worker verify the credibility or veracity of a source with the kind of scrutiny reserved for criminal cases").

Plaintiffs argue that Defendants made unwarranted assumptions about Victoria in two ways.  First, Plaintiffs complain that Defendants took into consideration ACT nurse Vukcevic's concerns that Victoria might not remain stable on a reduced dosage of medication and that she had a history of becoming easily agitated.  (Pls. Reply Mem. 15–16.)  Plaintiffs argue that Vukcevic's concerns constituted unwarranted assumptions because they "assumed that Victoria would not comply with a higher regimen of medication if her doctor believed a higher dosage was clinically indicated."  (*Id.*)  Plaintiffs maintain that "Victoria's understanding of her illness meant that she was highly likely to comply with her treatment regimen," which, "in turn, rendered the likelihood of Victoria becoming agitated unlikely."  (*Id.*)  These arguments are primarily complaints regarding the allegedly unwarranted assumptions of Vukcevic, a non-party, who appears to have a basis for her opinion.  Despite the fact that this information about Victoria's treatment was provided to Defendants by one of Victoria's caregivers, Plaintiffs argue

that Defendants made unwarranted assumptions by taking this information into account. (Oral Arg. Tr. 36:15–18.)

In making the decision to remove J.S., Defendants did take into consideration several pieces of information including: (1) Victoria wanted to stay on a lower dosage of medication in order to be able to respond to J.S. (Defs. 56.1 ¶ 36; Pls. 56.1 ¶ 36; Crofton Aff. ¶ 15); (2) Vukcevic was concerned that Victoria would be unstable on a lower dosage of her medication (Defs. 56.1 ¶¶ 36–37; Pls. 56.1 ¶¶ 36–37; Crofton Aff. ¶ 16); and (3) Victoria had a history of non-compliance with psychiatric treatment and medication (Defs. 56.1 ¶ 4; Pls. 56.1 ¶ 4; Banovich Dep. 25:4–11). However, there is no evidence to indicate that Defendants assumed that Victoria would not comply with a higher dosage of medication if her doctor decided it was necessary or that she would refuse to comply simply because of her mental disability. Defendants had reason to be concerned for J.S.'s safety whether or not Victoria took a higher dosage of her medication. If Victoria took the higher dosage, she slept so soundly that she missed phone calls, meetings, and even loud banging on her door. (Defs. 56.1 ¶ 9; Lunde Dep. 21:1–13.) If she took the lower dosage, according to Vukcevic, she might not be stable. (Defs. 56.1 ¶¶ 36–37; Pls. 56.1 ¶¶ 36–37; Crofton Aff. ¶ 16.) Either way, medical professionals and experienced case managers advised Defendants that Victoria might not be able to care for J.S. on her own.

The fact that Defendants considered information such as Victoria's history of noncompliance with medication in their decision to remove J.S. does not support Plaintiffs' argument that Defendants engaged in impermissible stereotyping. Plaintiffs argue that just because someone with a mental illness was noncompliant in the past, does not mean that the person will be noncompliant in the near future. (Pls. Reply Mem 16.) There is no evidence that

Victoria's past noncompliance was because of her mental illness or that Defendants assumed that Victoria's mental illness would cause her to be noncompliant with her medication when J.S. was released. Defendants only took into consideration the *fact* that Plaintiff had a history of noncompliance — information that would be relevant regardless of Plaintiff's mental disability.

Second, Plaintiffs argue that Defendants impermissibly assumed that Victoria's nervousness in handling J.S. in the hospital amounted to evidence of the onset of decompensation. (Pls. Reply Mem. 15–16.) Defendants obtained information from the State Central Registry reporting party that Victoria was agitated and nervous at the hospital, and that she did not handle the infant well. (Crofton Aff. ¶¶ 3–4.) There is no evidence that Defendants assumed that this amounted to the onset of decompensation.

In support of this argument, Plaintiffs offer the testimony of Dr. Roy Lubit, a psychiatrist, who reviewed the evidence in this case and concluded that Victoria did not present such an imminent risk of harm to J.S. as to warrant emergency removal, (Deposition of Roy Lubit ("Lubit Dep.") ¶ 4), and that DSS workers made unfounded assumptions about Victoria's ability to care for J.S. (Lubit Dep. ¶ 5.) Dr. Lubit's opinion is not based on any technical expertise that is necessary to resolve a highly complex factual issue or on a scientific study or a particular methodology. *See* Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."). Instead, Dr. Lubit's testimony is based solely on his own legal conclusions on the core issues in the case

based on facts in the record. There is simply no legal support for the admission of his opinion. *Cf. Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 99, 103 (D. Conn. 2006) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1293 (2d Cir. 1991)) (holding that expert opinion "includes two legal conclusions based on certain facts in the record and therefore impermissibly invades the jury's province to apply the applicable law to the facts of the case and reach ultimate legal conclusions").

Even if Dr. Lubit qualified as an expert under the Federal Rules of Evidence, his largely conclusory affidavit adds nothing in the way of evidentiary support for Plaintiffs' claim that Defendants discriminated against Victoria. *Pacheco v. N.Y. Presbyterian Hosp.*, 593 F. Supp. 2d 599, 625 (S.D.N.Y. 2009) (granting defendants' motion for summary judgment where plaintiff's expert report added "nothing in the way of evidentiary support" for plaintiff's claim); *see also CL-Alexanders Laing & Cruickshank v. Goldfeld*, 739 F. Supp. 158, 164 (S.D.N.Y.1990) ("[W]hile expert opinion may be helpful, summary judgment can be defeated only by the allegation of specific facts. A particular set of facts 'cannot be established by mere speculation or idiosyncratic opinion, even if th[e] opinion [about the facts] is held by one who qualifies as an expert.'" (quoting *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 187, 193 (2d Cir. 1987))).

Notwithstanding Dr. Ludit's testimony, the undisputed facts, viewed in the light most favorable to Plaintiffs, demonstrate that there is no genuine issue as to whether Defendants discriminated against Victoria. *See Kelsey v. City of New York*, No. 03 Civ. 5978, 2007 WL 1352550, at *6 (E.D.N.Y. May 7, 2007) (holding that, where proposed expert's opinions are "based solely on his own conclusions, drawn from the undisputed facts of this case," the court is "free to conclude that, notwithstanding [the expert's] testimony," defendants are entitled to summary judgment on the matter upon which the expert opined); *Talmage v. Trust*, 871 F. Supp.

1577, 1585 (E.D.N.Y. 1994) (finding that the "conclusory assertions" of plaintiff's expert, "in light of the evidence submitted by defendants, are not sufficient to raise a genuine issue of material fact").  Defendants based their decision to remove J.S. on a wide-range of evidence pertaining to Victoria's conduct and behavior that raised concerns regarding Victoria's ability to care for J.S., not based on her disability.  *See Bolmer*, 594 F.3d at 148–49 (Title II claim could proceed where defendants incorrectly concluded that plaintiff's relationship was a delusion based on plaintiff's mental illness, conducted a non-individualized and cursory examination, and committed plaintiff to a hospital, as *but-for* defendants' stereotyped assumption, plaintiff would not have been committed).  The Court grants Defendants' motion for summary judgment on the ADA and Rehabilitation claims, and Plaintiffs' motion for summary judgment on these claims is denied.

## III.    Plaintiffs' Motion to Amend the Complaint

Plaintiffs request permission to amend the Complaint to substitute Suffolk County for DSS and to add Elizabeth Hogan, Defendant Crofton's supervisor, as a defendant.  Rule 15(a) of the Federal Rules of Civil Procedure states that "leave to amend a pleading 'shall be freely given when justice so requires.'"  *Steger v. Delta Airlines, Inc*., 382 F. Supp. 2d 382, 387 (E.D.N.Y. 2005).  However, it is "ultimately within the sound discretion of the court whether to grant leave to amend."  *MHANY Mgmt. Inc. v. County of Nassau*, 843 F. Supp. 2d. 287, 340 (E.D.N.Y. 2012) (internal quotation marks omitted).  A court may deny a motion to amend a complaint because of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Straker v. Metro. Transit Auth*., 333 F. Supp. 2d 91, 102–03 (E.D.N.Y. 2004) (citations omitted).  Leave to amend will be denied

as futile "only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.,* if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese v. Rust-Oleum Corp*., 244 F.3d 104, 110 (2d Cir. 2001).

As discussed above in Part II(c)(iv), Plaintiffs have failed to present any evidence that Suffolk County is liable under a theory of municipal liability based upon its alleged failure to train its caseworkers. Plaintiffs have presented no evidence to support a procedural due process, substantive due process, or unlawful seizure claim against Hogan. As discussed above, based on the facts of this case, including the fact that Victoria was upset around J.S. at the hospital (Crofton Aff. ¶¶ 3–4), slept heavily and was unresponsive due to her medications, (*id.* at ¶ 13), had a history of not complying with her medications, (Defs. 56.1 ¶ 4; Pls. 56.1 ¶ 4; Banovich Dep. at 25:4–11), and could have become unstable on a lower dosage of medication, (Crofton Aff. ¶ 15), there was sufficient "objectively reasonable" evidence that Victoria could not care for J.S. by herself and therefore presented a "danger to the child's life or health." Thus, no rational jury could find, without impermissibly speculating, that at the time Hogan ordered J.S.'s removal, there was time, entirely consistent with J.S.'s safety, to seek a court order.[23] Therefore, Plaintiffs cannot proceed with their § 1983 claims against Suffolk County or Hogan.

Plaintiffs have also failed to show that Victoria was discriminated against on the basis of her disability, and, therefore, Plaintiffs cannot proceed on an ADA or Rehabilitation Act claim against Suffolk County or Hogan. Thus, substituting Suffolk County for DSS and adding Hogan as a defendant would be futile. The Court denies Plaintiffs' motion to amend the Complaint.

---

[23] Even if Plaintiffs had established that emergency circumstances did not exist at the time of J.S.'s removal, Hogan would be entitled to qualified immunity. *See supra* note 16.

**IV.    Conclusion**

For the foregoing reasons, the Court grants Defendants' motion for summary judgment on all claims and denies Plaintiffs' cross-motion for partial summary judgment.  The Court also denies Plaintiffs' request to amend the Complaint to add Suffolk County and Elizabeth Hogan. The Clerk of the Court is directed to close the case.


SO ORDERED:


_____
      s/ MKB
MARGO K. BRODIE
United States District Judge


Dated:  March 25, 2013
        Brooklyn, New York